UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                           CRIMINAL NO. 07-20403

        v.                                    DISTRICT JUDGE VICTORIA A ROBERTS

RICHARD EMERSON, D.O.,         MAGISTRATE JUDGE VIRGINIA MORGAN
RICHARD TESTAI,

        Defendants.
_____/

## REPORT AND RECOMMENDATION

This matter is before the court on defendant Emerson's Motion to Suppress Evidence (D/E 66). At oral argument, counsel for defendant Testai stated he wished to join in the motion.[1] Defendant Emerson claims that the search warrant was overly broad and did not sufficiently limit the property to be seized. Further, defendant submits that the search is not saved by either the good faith exception to the warrant requirement in U.S. v. Leon, 468 U.S. 897, 923 (1984) or the government's reliance on the doctrine of inevitable discovery. The matter was referred to the undersigned and oral argument was held on the motion. For the reasons discussed in this report, it is recommended that the motion be denied.

---

[1]Because of the recommendation to deny the motion, it is not necessary to discuss whether co-defendant Testai would have standing to challenge the seizure.

-1-

Defendant Emerson, D.O., and his co-defendants are charged by indictment with 108 counts of illegal drug distribution, conspiracy, and related charges. The charges arose from the operation of the Emerson Medical Clinic owned and run by defendant Emerson. The indictment was filed on or about August 28, 2007. The search warrants were presented to the undersigned, and issued and executed on or about January 11, 2005. Five search warrants were presented. These were for Emerson Medical Clinic, Emerson's residence, storage unit C-3-84 at Mom's Attic, a 1999 Chevrolet Tahoe, and a 2002 Chrysler Sebring (Emerson's personal vehicles). The motion seeks suppression of all the evidence on the grounds that the warrants (each of which relied upon the same affidavit) should have been limited to files directly related to the investigation at that point. That is, that the files should have been limited to those of particular patients but not "all patient files." (Memorandum, part of D/E 66)

The government submits that the investigation and the affidavit in support of the warrants establishes that Emerson's clinic, at least as of the date of execution of the warrants, had engaged in a long standing and pervasive business of illegally distributing controlled substances. Therefore, there was probable cause to believe that the business was "so permeated by with the illegal distribution of drugs" as to authorize the seizure of patient and business records.

*Analysis*

Defendant challenges the breadth of the warrant which authorized the seizure of all patient records. When reviewing a magistrate judge's probable cause determination, we look to whether there was "a substantial basis for the decision." United States v. Lalor, 996 F.2d 1578, 1581 (4th Cir. 1993). "[A]fter-the-fact scrutiny by courts of the sufficiency of an affidavit"

should accord "great deference" to the magistrate's determination of probable cause. Illinois v. Gates, 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (internal quotation marks omitted).[2]

The Fourth Amendment of the United States Constitution governs all searches and seizures conducted by government agents and prohibits unreasonable searches. Unless an exception applies there is a presumptive warrant requirement for searches and seizures. Katz v. United States, 389 U.S. 347, 357 (1967). The usual remedy for a violation of the Fourth Amendment is suppression. Weeks v. United States, 232 U.S. 383, 398 (1914).

A warrant must be supported by probable cause and describe the items to be seized with particularity. The particularity requirement in the Amendment prohibits the issuance of warrants that would let officers seize "one thing under a warrant describing another." Davis v. Gracey, 111 F3d. 1472, 1478 (10th Cir. 1997). The degree of specificity with respect to the particularity requirement will vary depending on the crime involved and the types of items sought. United Sates v. Ables, 167 F.3d 1021, 1033 (6th Cir. 1999). When business records are sought, the warrant must be as particular as the information available may allow. Courts may authorize the seizure of an entire class of items based on the "permeated with fraud" exception to the particularity requirement. National City Trading Corp. v. U.S., 635 F.2d 1020, 1026 (2nd Cir. 1980).

---

[2]Because I issued this warrant and I wish to err on the side of caution, I have scrutinized it without the usual deference and looked closely in essentially a *de novo* review.

United States v. Hurwitz, 459 F.3d 463 (4th Cir. 2006) discussed the "permeated with fraud" exception and is relied on by the defendant. There, the court held that the Fourth Amendment requires that a warrant be "no broader than the probable cause on which it is based." United States v. Zimmerman, 277 F.3d 426, 432 (3rd Cir. 2002) (internal quotation marks omitted). "Although the concept of probable cause resists an exacting definition, it 'exist[s] where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found' in a particular place." United States v. Perez, 393 F.3d 457, 461 (4th Cir. 2004) (quoting Ornelas v. United States, 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996)). An assessment of probable cause by an impartial magistrate judge must take into account "the totality of the circumstances," Maryland v. Pringle, 540 U.S. 366, 371. In Hurwitz, the Attachment to the supporting affidavit, which the court read as part of the search warrant, identified specific "items to be seized," including "patient medical and billing files" and all related records and documents, including "complete medical files." Hurwitz argued that because the supporting affidavit was based on statements of only five of Hurwitz's numerous patients, there was insufficient probable cause for the government to seize all of the files. The court disagreed.

The court stated:

> There is no requirement that the government have evidence relating to each and every patient of Hurwitz to support the seizure of all of the files in this case:
> 
> [W]here there is probable cause to believe that a business is "permeated with fraud," either explicitly stated in the supporting affidavit or implicit from the evidence therein set forth, a warrant may authorize the seizure of all documents relating to the

> suspected criminal area but may not authorize the seizure of any severable portion of such documents relating to legitimate activities. United States v. Oloyede, 982 F.2d 133, 141 (4th Cir. 1992) (internal quotation marks omitted).

In Oloyede, the Fourth Circuit affirmed the conviction of a lawyer who was involved in a scheme to defraud the government by falsifying immigration papers. Like Hurwitz, the lawyer in Oloyede challenged the scope of a search that seized all of his clients' files, claiming that the government should have limited the search to files reviewed by the agent who testified in support of the warrant or to files involving similar immigration applications. The court rejected this argument, holding that the seizure of all of the files was justified by probable cause that the business was "permeated with fraud." Id.

The question in Hurwitz's case, as in the instant challenge brought by Emerson, is whether a substantial basis existed for the issuing judge to find probable cause that Hurwitz's medical practice was permeated with his drug trafficking activity such that all of his patient files could be seized.

In Hurwitz, Agent Lucas indicated in his affidavit that he discovered "an unusually high incident of arrests of individuals for distributing prescription narcotics" in certain regions in Virginia, West Virginia, and Tennessee, and that "[a] significant number of these arrests" resulted in the identification of Hurwitz as the source of the prescription drugs. He then recounted evidence suggesting that Hurwitz commonly performed only the most cursory examinations-if he performed them at all-prior to prescribing heavy doses of controlled substances. According to Agent Lucas, Hurwitz had a reputation in the drug community for his

practice of prescribing high amounts of narcotics, and one cooperating source claimed to have become a patient for that very reason. Additionally, Agent Lucas indicated that Hurwitz demanded $1,000 "initiation fees" from patients, as well as $250 monthly "maintenance fees," to be paid in cash, suggesting that Hurwitz made a common practice of fronting drugs rather than practicing medicine. According to the supporting affidavit, Hurwitz's activities as a mere drug dispenser followed a well-established pattern in that Hurwitz's license to practice medicine was suspended in Virginia in 1996 for over-prescribing controlled substances to "at least" 26 patients, and that the District of Columbia Board of Medicine likewise suspended his license for similar reasons in 1992. Additionally, the Lucas affidavit included facts suggesting that Hurwitz apparently understood that his patients, on a wide-spread basis, were re-selling and distributing the controlled substances that he prescribed to them in the first instance. Hurwitz purportedly told one patient "something to the effect that all of his patients were being arrested" and "that he had patients in other states who were being arrested."

Similarly, Agent Albert in the instant case indicated in her affidavit that evidence of illegal prescriptions had been ongoing for at least two years, since 2003. She discovered based on her review of State of Michigan Automated Prescription Service (MAPS) that Dr. Emerson wrote large quantities of prescriptions for controlled substances, that he kept track of where and when some of his patients fill their prescriptions, that he wrote a large number of prescriptions for his girlfriend, and that some of the patients used a number of different pharmacies. In 2003, he wrote 9,177 prescriptions for controlled substances. The affidavit contained a statement from a pharmacist at Blue Cross/ Blue Shield who reviewed the prescriptions written by Emerson and

-6-

paid for by Blue Cross. The pharmacist detailed several areas of Emerson's dispensing practice that led the pharmacist to question whether Emerson was providing legitimate medial care within the usual course of professional medical practice. (Par. 34) In addition, a physician (Board Certified in Pain and Medicine and a professor at the University of Michigan) opined that after medical review and interview of one of the undercover operatives, "Emerson is prescribing prescriptions without a medical reason and not providing care to his patients . . and not monitoring his patients properly in a manner in which a legitimate physician would." (Par. 35) Further, following a robbery of the medical clinic in August, 2004, the employees were interviewed by the local police. They explained that Emerson was not usually there when the clinic opened, that he usually did not take insurance but required cash (generally over $14,000 a week was received), and only recently opened a bank account. Mondays and Fridays were very busy days where they took in $3,000 to $4,000. Employees were paid in cash at the end of every day. Further, Emerson normally pre-signed approximately 50 pre-numbered prescriptions every morning so that the employees could write out the prescriptions for current patients. Each prescription was placed on the patient's chart so that Emerson could review and make sure they were not writing any prescriptions without his knowledge. (Par. 36) One employee advised that Emerson would sell prescriptions out the back door of the office and at a nearby K-Mart parking lot. Also, that Emerson would call phony prescriptions into pharmacies by using other people's names. The employee also advised the Emerson had a storage unit nearby where he kept patient charts and receipts and things that he didn't want found. Further, Emerson had a particular group of people for whom he wrote prescriptions for OxyContin. These individuals would then

sell the pills and bring back half of the proceeds to him. One of these people was identified by the employee and the MAPS report of 2004 showed that he had been prescribed almost 1000 OxyContin #80 mg. pills by Emerson.

Further, confidential informant and undercover operatives were used in the investigation. These individuals paid money (usually $60), received their prescription, and were not examined or seen by the doctor. (Par. 10 -28) As in <u>Hurwitz</u>, there is a plethora of evidence suggesting that Emerson commonly performed only the most cursory examinations-if he performed them at all-prior to prescribing heavy doses of controlled substances. Like Hurwitz, Emerson had a reputation in the drug community for his practice of prescribing high amounts of narcotics, and one cooperating source claimed to have become a patient for that very reason. (See, Par. 39, statement of "patient" Hemphill). Like <u>Hurwitz</u>, Agent Albert's affidavit included facts suggesting that Emerson apparently understood that his patients were re-selling and distributing the controlled substances that he prescribed to them in the first instance. Moreover, in Emerson's case, he shared in this bounty of re-selling. Both Emerson and Hurwitz had patients in other states, dealt in large amounts of cash, wrote a large number of prescriptions for controlled substances, and were not providing these drugs as part of a legitimate medical practice.

Agent Albert's affidavit provided a substantial basis to find probable cause that Emerson's practice was permeated with the illegal distribution of drugs. See <u>Oloyede</u>, 982 F.2d at 141. The evidence of Emerson's common practice gave reason to believe that he "consistently

departed from accepted professional standards" and "was not practicing medicine, but was instead cloaking drug deals under the guise of a professional medical practice." See, Hurwitz, 459 at 473-474, *quoting* United States v. Alerre, 430 F.3d 681, 691 (4th Cir.2005), *cert. denied*, 547 U.S. 1113, 126 S.Ct. 1925, 164 L.Ed.2d 667 (2006). Because the affidavit was sufficient with respect to particularity, it is not necessary to find that the good faith exception of Leon applies. Accordingly, it is recommended that the motion to suppress be denied.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. Thomas v. Arn, 474 U.S. 140 (1985); Howard v. Secretary of HHS, 932 F.2d 505, 508 (6th Cir. 1991); United States v. Walters, 638 F.2d 947, 949-50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. Willis v. Secretary of HHS, 931 F.2d 390, 401 (6th Cir. 1991); Smith v. Detroit Fed'n of Teachers Local 231, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be no more than 20 pages in length

unless, by motion and order, the page limit is extended by the court.  The response shall address each issue contained within the objections specifically and in the same order raised.

>                             s/Virginia M. Morgan
>                             Virginia M. Morgan
>                             United States Magistrate Judge

Dated: September 17, 2008

---

### **PROOF OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record via the Court's ECF System and/or U. S. Mail on September 17, 2008.

>                             s/Jane Johnson
>                             Case Manager to
>                             Magistrate Judge Virginia M. Morgan